## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID E. RHODES,                          )
                                          )
                Plaintiff,                )
                                          )       CIVIL ACTION NO. 3:2006-156
        v.                                )
                                          )       JUDGE GIBSON
SCI-SOMERSET, and                         )
GERALD ROZUM, in his individual           )
and official capacity as warden of        )
SCI-Somerset,                             )
                                          )
                                          )
                Defendants.          . )

# **MEMORANDUM OPINION and ORDER OF COURT**

**GIBSON, J.**

This matter comes before the Court on Defendants SCI-Somerset's and Gerald Rozum's joint

Motion for Summary Judgment (Doc. No. 33). In accordance with the analysis herein, the Court will

grant the motion for summary judgment.

## I. **Factual Background**[1]

Plaintiff David E. Rhodes, R.N., is a nurse in the Pennsylvania Department of Corrections

(DOC), working at the State Correctional Institution at Somerset (SCI-Somerset). On July 17, 2006,

Rhodes filed his complaint (Doc. No. 1). Rhodes contends that "[f]rom October 2003 [he] has been

---

[1]The following facts are based upon Defendants' Concise Statement of Material Facts Not in Dispute (Doc. No. 35), and
the Plaintiff's Response thereto (Doc. No. 42) and Defendants' and Plaintiff's Exhibits. (Doc. Nos. 36, 42, 44). Any
proposed facts not contained within the following recitation of facts were found by the Court to remain disputed in the record
or to be immaterial.

harassed and discriminated against, suffered a hostile work environment, disparate treatment because of his sex (male), sexually harassed and retaliated against for reporting the same." Doc. No. 1, ¶ 12. Rhodes further alleges that the Defendants' acts violated Title VII of the Civil Rights Act, 42 U.S.C. §§2000e *et seq*, 42 U.S.C. §1983, and the Pennsylvania Human Relations Act (43 P.S. §§ 95 *et. seq*) Doc. No. 1, ¶¶ 11-19, 20-36, 37-43.

Defendants earlier challenged Rhodes' claims via a motion to dismiss (Doc. No. 9). By Order dated August 21, 2007, this Court granted in part and denied in part the Defendants' motion to dismiss. The motion was denied to the extent it challenged Rhodes' Title VII claim based on conduct that Rhodes alleged occurred on or after January 6, 2006. The motion was granted in all other respects, thereby dismissing the Title VII claims based on all other conduct that allegedly occurred prior to January 6, 2006, Rhodes' 42 U.S.C. §1983 claim, and his PHRA claim. Doc. No. 22. Therefore, the only remaining claims are those based upon Title VII for behavior alleged to have occurred on or after January 6, 2006. However, this opinion references several earlier incidences for contextual purposes.

Prior to January 6, 2006, Rhodes witnessed Beth Sterner, L.P.N., standing between the legs of a male correctional officer in the pharmacy of the infirmary. Deposition of David E. Rhodes ("Rhodes Dep."), Doc. No. 36, Ex. C, p. 10). Rhodes stated that female employees regularly fooled around sexually with male correctional officers. *Id.* at 51. Rhodes further stated that such behavior occurred "whether the female RN was in charge or I was there. I was sure that was happening when both of us were –either of us were there."*Id.* After witnessing Beth Sterner and the male correctional officer together, Rhodes stated to Karen Kennedy, L.P.N., that "I was just in the pharmacy and it looked like Beth was giving this officer a lap dance." *Id.* at 10. Rhodes reported this behavior to his superiors.

2

Former SCI-Somerset Captain Donald Brown testified that when he found out about the alleged misconduct, he ordered the medical department off limits to correctional officers. Brown further ordered that nurses would no longer dispense medicine in the Restricted Housing Unit (RHU), and that no one would be allowed to tie up the phone lines to the medical department. Additionally, Brown ordered his subordinate Lieutenant Griffin to enforce this order in Brown's absence. Deposition of Donald Brown, Document No. 36, Exhibit H, pp. 56, 13, 14-15, 18.

After this incident, Rhodes claims that his co-workers and correctional officers mocked his comment about lap dancing for two to three years. Rhodes Dep., pp. 11, 50. Rhodes explained that correctional officers would come to the medical area and the meal room and say: "Who do I need to see to get a lap dance?" *Id.* at 11. Rhodes further explained that these comments were made as he was going through the metal detector and that comments mocking him as a homosexual were also made. *Id.* Rhodes stated that these comments were made to "harass [him] in front of a group when [he] was passing through." *Id.* at 12. Rhodes also stated that his working relationship with the female nurses in his department also changed after he reported their misbehavior, in that they would not listen to his direction and were inefficient in their work. *Id.* at 14-16. According to Rhodes, at least four other male nurses at SCI-Somerset have worked with these female nurses, none of whom have had any problems. *Id.* at 95. Additionally, Rhodes stated that Officer Kassander, a male correctional officer who formerly worked in the infirmary, transferred because he feared some type of issue with the female LPNs for reporting wrongdoing. *Id.* at 47.

One morning after arriving home from work, Rhodes discovered a bumper sticker on his vehicle that stated "Proud to be Gay." *Id.* at 26. While Rhodes believes that a corrections officers was

3

responsible, he does not know who actually placed the sticker on his vehicle. *Id.* at 26. Rhodes also stated that his name stamp went missing on a few occasions, only to be found later in a trap door in the hallway. *Id.* at 27. Rhodes does not know who hid his stamp. *Id.* at 28. Rhodes further stated that on April 1, 2006, Sergeant Shawley needlessly delayed him at a prison gate during an emergency call. Rhodes Affidavit, Doc. No. 43, Ex. 1.

Rhodes avers that he "experienced hang up phone calls, if [he] would answer when the Corrections Officers were calling for the female nurses." *Id.* When asked whether he knew about the hang-up calls Rhodes received, former Department of Corrections (DOC) Captain George Griffin responded, "[y]eah, I think I remember [Rhodes] saying something about, you know, phone - and that's something that typically happens. Guys mess around. That wasn't something that just happened to [Rhodes]. That happened throughout the institution, to everybody. Playing games." (Deposition of Captain George Griffin ("Griffin Dep."), Doc. No. 36, Ex. D, p.10). Rhodes stated that "some of these calls were placed to the emergency line." Rhodes Affidavit, Doc. No. 43, Ex. 1. Rhodes did not know who perpetrated these hang-up calls and said that nothing was ever done to stop them. Rhodes Dep., p. 31. Rhodes also claims that Beth Sterner, L.P.N., used the pharmacy phone for non-work related phone calls. Complaint, Doc. No. 1, ¶ 12(m).

Rhodes claims that his employee evaluation on April 6, 2006 was unjustly low due to retaliation. DOC's evaluation system utilizes five possible ratings: outstanding, commendable, satisfactory, needs improvement, and unsatisfactory. Rhodes' reviews are tabulated by the Court for ease of comparison

4

as follows. Rhodes' July 2001 to July 2002 evaluation included the following marks[2]:

| category | rating |
|---|---|
| job knowledge/ skills | commendable |
| work results | commendable |
| communications | needs improvement |
| initiative/problem solving | commendable |
| interpersonal relations/equal employment opportunity | needs improvement |
| work habits | satisfactory |
| overall | satisfactory |

Rhodes' July 2002 to July 2003 evaluation included the following marks[3]:

| category | rating |
|---|---|
| job knowledge/ skills | commendable |
| work results | satisfactory |
| communications | outstanding |
| initiative/problem solving | outstanding |
| interpersonal relations/equal employment opportunity | outstanding |
| work habits | satisfactory |
| overall | commendable |

---

[2]Rhodes' July 2001/July 2002 Employee Performance Review, Doc. No. 42, Ex. 2a.

[3]Rhodes' July 2002/ July 2003 Employee Performance Review, Doc. No. 42, Ex. 2b.

5

Rhodes' July 2003 to July 2004 evaluation is not in the record.

Rhodes' July 2004 to July 2005 evaluation included the following marks[4]:

| category | rating |
|---|---|
| job knowledge/ skills | commendable |
| work results | commendable |
| communications | satisfactory |
| initiative/problem solving | satisfactory |
| interpersonal relations/equal employment opportunity | satisfactory |
| work habits | commendable |
| overall | satisfactory |

Rhodes' July 2005 to July 2006 evaluation included the following marks[5]:

| category | rating |
|---|---|
| job knowledge/ skills | needs improvement |
| work results | needs improvement |
| communications | needs improvement |
| initiative/problem solving | needs improvement |
| interpersonal relations/equal employment opportunity | unsatisfactory |
| work habits | satisfactory |
| overall | unsatisfactory |

---

[4]Rhodes' July 2004/ July 2005 Employee Performance Review, Doc. No. 42, Ex. 2c.

[5]Rhodes' July 2005/ July 2006 Employee Performance Review, Doc. No. 42, Ex. 2d.

6

In his EEOC complaint, Rhodes claims that between May 18, 2006 and May 24, 2006, he noticed that two nurses were again delivering medications to the RHU. Second EEOC Charge of Discrimination, Doc. No. 36. This practice had previously been stopped in January, 2005, following Rhodes' complaint pointing out sexual misconduct. Upon Rhodes' complaint about this renewed practice, his superiors purportedly responded that "They did not have to justify their actions to [him]." *Id.* From 2003 until the present, Rhodes has not been promoted or demoted, and is still employed at SCI-Somerset as a nurse. Rhodes Dep., pp. 29-30. In 2007, Rhodes won a bid for a daytime shift, but that shift was never posted. *Id.* at 33-34. Rhodes stated that a female nurse was given the shift. Rhodes Affidavit, Ex. 1. Rhodes also applied for a transfer to the Pittsburgh facility, but did not receive the transfer. *Id.* Rhodes' basic pay records reveal that he received constant pay raises from 2004 until the present. Rhodes' Basic Pay Records, Doc. No. 36, Ex. F. Rhodes also received several annual/longevity general pay increases, and signing bonus raises. *Id.*

Rhodes treated the mental anguish he allegedly endured at the hands of SCI-Somerset personnel with Ambien, a sleeping aid he received from his primary care physican. Rhodes Dep., pp. 80-81. Rhodes saw a mental health professional on one occasion. Rhodes Dep., pp. 78-79.

## II.    **Analysis**

### A.    **Summary Judgment Standards**

The following standards are applied in ruling upon a motion for summary judgment:

> Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552- 57, 91 L.Ed.2d 265 (1986) ; Fed. R. Civ. P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. and Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chem. Corp., v. Teamsters Union Local No.* 408, 37 F.3d 123, 125-126 (3d Cir. 1994).

Federal Rule of Civil Procedure 56 (c) states in pertinent part that judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes*, 398 U.S., at 158-159, 90 S. Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68

S. Ct. 1031, 92 L. Ed. 1347 (1948).

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 - 2514, 91 L. Ed.2d 202, 216 (1986).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.Rule Civ.Proc. 56(e) (emphasis added). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986)(internal citations omitted)(footnote omitted).

**B.     Discussion**

**1.     Rhodes' Complaint**

Rhodes and the Defendants have differing opinions as to the relevant facts in this case. Since Rhodes did not amend his Complaint, only three of his averments directly reference a date on or after January 6, 2006. However, he asserts that many of the other averments, even those with earlier, specific date references, deal with continuous and ongoing behavior of the Defendants. He also references several other alleged incidences that were absent from the complaint. Defendants make two arguments with regard to the Complaint itself. First, they claim that the Complaint is not properly before this Court as it fails to comply with the filing deadlines for Title VII claims and was used to circumvent the deadlines. Second, they claim that the Complaint fails to satisfy the requirements of the notice pleading system with regard to the fourth and fifth claims.

Defendants specifically argue that Rhodes' Complaint was filed after the ninety day period

9

following Rhodes' receipt of his first right to sue letter. This Court already determined that due to the late filing, all allegations of misconduct prior to January 6, 2006 have been dismissed. Defendants further claim that since the second right to sue letter was not received until after the Complaint was filed and the Complaint was never amended, that the Complaint is a legal nullity. The Court addressed Defendants' arguments in its order of August 21, 2007 stating:

> Title VII plaintiffs need not exhaust their administrative remedies when allegations of discrimination are fairly encompassed within previously exhausted claims. *Robinson v. Dalton*, 107 F.3d 1018 (3d Cir. 1997)(citing *Waiters v. Parsons*, 729 F.2d 233, 235 (3d Cir. 1984). However, any exhaustion defect that may have existed with regard to Rhodes' Second EEOC Charge was cured when the EEOC issued a right-to-sue letter in August 2006. *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997) (holding that possession of a right-to-sue letter is not a jurisdictional prerequisite to a Title VII action); *Molthan v. Temple Univ.*, 778 F.2d 955, 960 (3d Cir. 1985) (suggesting that the right-to-sue letter need only issue prior to trial); *Tlush v. Mfrs. Res. Ctr.*, 315 F. Supp. 650, 654-55 (E.D. Pa. 2002) (finding that the issuance of a right-to-sue letter can cure the procedural defects of a previously filed federal complaint where the letter is received prior to trial and the defendant is not prejudiced). It is therefore immaterial whether the fresh violations alleged in the Second EEOC Charge are fairly encompassed by the investigation stemming from the First EEOC Charge. Furthermore, Defendants' failure to challenge the new allegations of the Second EEOC Charge constitutes a waiver of that defense. *Communs. Works of Am., Local 1033 v. N.J. Dep't of Pers.*, 282 F.3d 213, 216-17 (3d Cir. 2002). Rhodes may therefore proceed with his Title VII allegations to the extent they are based on conduct that occurred after January 5, 2006.

Doc. No. 22, p. 11. Finally, Defendants argue that Rhodes filed his successive EEOC complaints to attempt to circumvent the 90 day filing limitation. No evidence supports this contention. Therefore, this Court's previous determination stands, namely that the Title VII allegations based on conduct occurring after January 5, 2006 are properly before this Court.

10

Defendants' second argument involves Rhodes' factual allegations that he received a lower evaluation on April 6, 2006 in retaliation for his reporting misconduct, and that two nurses were returned to the RHU rotation. Defendants claim that the failure to include these two "claims" in the complaint means that the complaint fails to meet notice pleading requirements. The Court presumes that Defendants would make the same argument with regard to Rhodes' contention that he was denied a transfer to the Pittsburgh facility due to his 2006 evaluation, and the non-fulfillment of his transfer to the daytime shift. Rhodes cites these incidences as evidence of disparate treatment and retaliation.

"[S]implified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures...to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley v. Gibson*, 355 U.S. 41, 47-48, 78 S. Ct. 99. 103 2 L. Ed. 2d 80, 85 (1957). "[A] claimant does not have to set out in detail the facts upon which the claim is based, but merely provide a statement sufficient to put the opposing party on notice of the claim." *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001). "At the pleading stage . . .the Plaintiff need only set forth 'a short and plain statement of the claim' showing that the pleader is entitled to relief as required by Federal Rule of Civil Procedure 8 (a)(2)." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004). Rhodes alleged discrimination, retaliation, harassment, and hostile work environment claims. In his Complaint, Rhodes reported sexual misconduct perpetrated by other nurses and corrections officers, and alleged: "Defendant fails to maintain and insure a workplace free from sex and gender discrimination and retaliation for reporting the same. In retaliation for making a complaint, Plaintiff endures a hostile work environment and retaliation in a dangerous and violent workplace, all to protect the perpetrators of sexual gender harassment and discrimination." Doc. No. 1, ¶ 12(e).

11

Rhodes further stated that "C.O.'s and Security, direct all staff in a lock down or anytime security measures are needed. They are the ultimate supervisors in emergency situations. Employees are subject to pat down searches at anytime, they have to abide by emergency rules, and they have to report in and out to get through locked doors. By the quid pro quo behaviors, the female LPN's were getting out of work, able to take breaks they wanted for sexual favors and they wanted Rhodes to go along with their behaviors and do his work and their work too or face retaliation for speaking up against sexual harassments and discrimination." Doc. No. 1, ¶ 12 (g). Rhodes also set forth specific facts regarding being delayed at the gates by correctional officers and experiencing hang-up calls on phone lines in the infirmary.

Defendants are trying to argue that each separate factual allegation is somehow a separate "claim" under Title VII, and thus requiring specific pleading as to each instance. However, Rhodes essentially raises four claims under Title VII, for harassment, discrimination, hostile work environment, and retaliation. Rhodes' Complaint pleads basic statements supporting those claims. The facts referenced by the Defendants are individual instances and specific evidence of Defendants' misbehavior and need not be included in the complaint. The referenced factual averments were discoverable and could easily have been ascertained and scrutinized by the Defendants. Therefore, all of Rhodes' allegations pertaining to January 6, 2006 and after are properly before this Court.

## 2. TITLE VII Claims

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). One manner in which a plaintiff can meet this ultimate burden of

12

persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In cases where there is no direct evidence of discrimination, such as this one, the Third Circuit applies the burden-shifting analysis set forth in *McDonnell Douglas*. *See Barber v. CSK Distrib. Servs.*, 68 F.3d 694 (3d Cir. 1995). Under this analysis, a plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production–but not the burden of persuasion–shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n. 5 (3d Cir. 1998). The defendant may satisfy this burden by offering evidence of a nondiscriminatory reason for its action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

### a.) Disparate Treatment Discrimination Claim

Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). To state a claim for discrimination under Title VII against the DOC, a plaintiff must show by a preponderance of the

13

evidence that: (1) he was a member of the protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action despite being qualified; and (4) the employer treated an individual with qualifications similar to the plaintiff who was not a member of the protected class more favorably than plaintiff. *Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 (3d Cir. 2006). Rhodes alleges four instances of discrimination: 1) that female nurses took extra breaks that Rhodes was not privy to; 2) that Rhodes lost a transfer to the Pittsburgh facility; 3) that Rhodes was awarded a bid for a daylight shift but was never permitted to take the shift; and 4) that Rhodes lost opportunities for overtime when his shift was switched.

In assessing each of these matter, the Court first notes that Rhodes has not provided facts or documentation regarding his loss of overtime opportunities. Therefore, the Court cannot find that loss of overtime constitutes an adverse employment action in this instance. Additionally, while Rhodes claims that women nurses were given extra "breaks", he provides no evidence of such breaks. Rhodes provides no support that the nurses' forays were somehow sanctioned "breaks" to which he was not privy.[6] With respect to the two other allegations, Rhodes meets the first three prongs of a *prima facie* case. However, Rhodes provides no information whatsoever about a comparably qualified individual who was actually awarded the Pittsburgh position; thus, the claim based upon the denied transfer application does not meet the fourth prong of the test.

> The only remaining allegation is Rhodes' statement that a female nurse
> named "Rohrabaugh" worked the daylight shift that he had been

---

[6] It is further noted that Rhodes has admitted that these incidences of sexual misconduct occurred whether it was Rhodes or a female nurse in charge. Therefore the behavior and its consequences were not related to Rhodes' gender.

14

awarded. Other than a statement in his affidavit, Rhodes provides no evidence of the circumstances surrounding Rohrabaugh's work in the daylight shift or evidence of her qualifications. Rhodes states: The female nurses were awarded bids had their jobs posted, so that they could work their new position soon after being awarded the bid. Another nurse, Rohrabaugh was working the 6-2 shift that I had been awarded. My position was never posted and therefore, I could never work the 6-2 shift that I had been awarded. After approximately seven months my job was still not posted. I was offered a daylight position, but it would have been improper as to the contract to accept it, as SCI-Somerset still had not (*sic*) intention of posting my job. (Rhodes' Affidavit, Exhibit 1)

Rhodes does not allege that Rohrabaugh was chosen instead of him to fill the daylight position, only that she was filling that shift at the time. Rhodes provides no evidence of specific female nurses being awarded jobs while his job failed to be posted. Similarly, Rhodes provides no evidence that his qualifications were comparable to the female nurses who were allegedly rewarded daylight shifts in Rhodes' stead. For this and each other claim, Rhodes fails to meet the *prima facie* case requirement; Even viewing the facts in favor of Rhodes, he could not possibly prevail on this claim; therefore, Defendants are entitled to judgment as a matter of law on such claims.

### b. Hostile Work Environment/Harassment Claim

A successful hostile work environment claim under Title VII requires the following five elements: (1) the employee suffered intentional discrimination because of his or her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would have detrimentally affected a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). In making its determination, the Court must examine all of the

15

circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Put differently, the Court must evaluate the record as a whole to determine whether Rhodes provides sufficient evidence to prove his case, because "'[p]articularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities . . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Cardenas v. Massey,* 269 F.3d 251, 261 (3d Cir. 2001) (quoting *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 149 (3d Cir.1999)).

Rhodes claims that because he reported misbehavior, he was harassed by female nurses and male corrections officers, including numerous comments about "lap dancing." Rhodes strangely argues that had he been a woman, "he would have more easily been persuaded to be [quiet]." He further claims that the comments were embarrassing because "he was a moral male, not engaging in any promiscuous behavior." The Court does not follow the logical relevance of these assertions. Rhodes also alleges that homosexual comments were made by male corrections officers and that a bumper sticker stating "Proud to be Gay" was placed on his vehicle by an unknown individual. Rhodes alleges that guards purposely opened doors in a untimely fashion when he needed to proceed. Additionally, Rhodes states that his signature stamp went missing, and that he received hang-up phone calls on the infirmary phones from individuals whose identities were unknown. While Rhodes contends that these actions were taken because he was male, the evidence in the record fails to establish that these comments and actions were intentionally based on his gender. In addition, it is unknown whether the alleged actions were taken by

16

his co-workers. Rhodes' belief that he would have been treated differently if he had been female, in the absence of record evidence, is mere speculation and is therefore insufficient to prove discrimination. *Bullock v. Children's Hosp. of Philadelphia*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999).

Rhodes admits that he made a comment about "lap dancing" to a fellow nurse upon finding two co-workers in a sexual position at work. Rhodes then was subjected to many comments by co-workers relating to lap-dancing. The Court has not been persuaded, nor does it find any evidence, that this issue occurred because of Rhodes' gender. Additionally, no evidence has been presented that a woman would have been treated differently under the circumstances. While Rhodes claims that these comments were embarrassing, this allegation does not lead to an inference of gender bias. Rhodes also has failed to show that any of the other workplace slights were related to his gender.

Finally, Rhodes states that he is not a homosexual. The Court is not sure of the relevance of this averment. Discrimination based on sexual orientation is not actionable under Title VII. *Bibby v. Philadelphia Coca-Cola Bottling Co.*, 85 F. Supp. 2d 509, 516-17 (E.D. Pa. 2000). Therefore, comments aimed at an individual's sexual orientation, while obviously inappropriate and juvenile, are not actionable under Title VII. Therefore, Rhodes fails to raise necessary evidence that he suffered intentional discrimination because of his gender. As a result, Defendants are entitled to judgment as a matter of law as to Rhodes' sexual harassment/hostile work environment claim.

#### c. Retaliation Claim

Retaliation claims brought under Title VII follow the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Jalil v. Avdel Corp.*, 873 F.2d 701, 706 (3d Cir. 1989); *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005); *Williams*

17

*v. Philadelphia Hous. Auth. Police Dep't.*, 380 F.3d 751 (3d Cir. 2004). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that 1) he engaged in protected activity (i.e. filing a claim with the EEOC); 2) defendant took adverse employment actions against him, and 3) there was a causal connection between the adverse action and his protected activity. *Fogelman v. Mercy Hosp.*, 283 F.3d 561 (3d Cir. 2002). To establish a causal connection, a plaintiff must show either temporal proximity between the protected activity and the adverse employment action, or evidence of ongoing antagonism. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

Rhodes contends that he reported sexual harassment and discrimination to his superiors at SCI-Somerset and that this action constitutes a protected activity under Title VII. Rhodes also filed several union grievances and two EEOC complaints. Defendants argue that the issues raised did not involve sexual harassment/discrimination, but instead simple personality conflicts with co-workers.

Courts have found action short of filing a law suit to be protected activity. Such actions as bringing an EEOC claim, or writing a letter complaining of specific discriminatory conduct, may constitute protected activities. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (citations omitted). For a retaliation claim, an employee does not need to show that the action he complains of is actually a violation of Title VII, instead he need only have a good faith belief that his behavior is protected conduct. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). Moreover, to prevail on a retaliation claim, Rhodes "need not prove the underlying discrimination complaint." *Griffins v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993). Therefore, it is possible that even where the underlying discrimination and harassment claims are dismissed, a valid retaliation claim may continue. Rhodes complained to superiors, filed two EEOC complaints, and filed grievances with

18

his union. Some of the complaints filed to superiors and with the union pertain to sexual misconduct between co-workers. However, Rhodes also alleges specific instances of harassment and discrimination. Even though this Court found above that these claims were meritless, sufficient evidence has been presented to suggest that Rhodes has a good faith belief that he suffered from discrimination and harassment. Therefore, viewing the facts most favorably to the Plaintiff, Rhodes would be entitled to put on evidence as to this first requirement that he engaged in a protected activity.

Recently, the Supreme Court clarified what a plaintiff must show to satisfy the second prong of a retaliation claim under Title VII. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). In the context of a retaliation claim, a plaintiff is not required "to show an 'adverse employment action' that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him of her employment opportunities, or adversely affects his or her status as an employee.'" *Moore v. City of Philadelphia*, 461 F. 3d 331, 341-42 (3d Cir. 2006) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). Likewise, employees claiming retaliation by harassment are not required to show harassment that "was 'severe or pervasive enough to create a hostile work environment' that would violate the anti-discrimination provision of Title VII in order to violate Title VII's protection from retaliation." *Id.* (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006).

In *Burlington Northern*, the Supreme Court distinguished the statutory language and purposes of the discrimination and retaliation provisions of Title VII and determined that the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern*, 548 U.S. at 62-63. The Supreme Court concluded that "[t]he scope of the anti-retaliation

19

provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 64. The Supreme Court articulated a new standard and held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable person from making or supporting a charge of discrimination." *Id.* at 65. In explaining a "materially adverse" action, the Supreme Court noted the importance of separating "significant from trivial harms" and went on to explain:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see Faragher*, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "snubbing' by supervisors and co-workers" are not actionable under §704 (a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson*, 519 U.S. at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. Id. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual §8, p 8-13.

*Id.* at 68.

In the instant case, Rhodes alleges several retaliatory events. The claims are similar to those made in the disparate treatment claim. Rhodes claims he was given a poor review in April 2006 due

20

to the retaliatory animus of SCI-Somerset's management, specifically Gerald Puskar who performed the review. Rhodes also argues that his request for transfer was denied because of this poor review. Further, Rhodes claims that he was prevented from moving to the day shift. Finally, Rhodes claims that his superiors failed to respond to his complaints and allowed the inappropriate behavior to continue.

Rhodes claims that his co-workers' violation of policy caused more than trivial harm to his job performance. First, Rhodes claims that hang-up calls took away from his job duties and prevented the use of the phone in the event of a real emergency. Second, Rhodes claims that when he is not let through the gate in a timely manner during an emergency, he is prevented from effectively performing his duties. Third, Rhodes claims that his subordinate's monopolizing of the phone hindered his performing the duties of his employment adequately. Fourth, Rhodes claims that the infirmary was running inefficiently because Rhodes' female subordinates would not listen to him after he reported their sexual misconduct. Finally, Rhodes claims that after Captain Brown left SCI-Somerset, the policy of two nurses distributing medications was re-instituted. This Court finds that these allegations do not rise to more than "the ordinary tribulations of the workplace." Hence, any facts based upon these allegations, even viewed in the most favorable light possible to Rhodes, could not possibly give rise to an adverse employment action. None of these raised issues constitutes a "materially adverse" action that would keep Rhodes from raising further concerns.

For instance, Rhodes claims that the fact that he was not transferred to the Pittsburgh office was a direct consequence of his poor review in July 2006. However, Rhodes provides no evidence with regard to his application for transfer or its denial. Rhodes merely states that he applied for a transfer and that it was denied due to his poor performance review. This Court finds that Rhodes' conclusory

21

statements, even when viewed favorably under the summary judgment standard, are not sufficient evidence to enable a finding that this action was "materially adverse."

However, the Court finds that the remaining complaints, including the non-realization of his day shift transfer, and his poor performance review, are "materially adverse" actions. The issue then becomes whether Rhodes could present sufficient evidence of a causal link between his protected activity and the adverse action by his employer. With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. *Abramson v. Wm. Patterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity...is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.")

In assessing the first factor, there must be a close temporal proximity between the protected activity and the adverse employment action. *Id.* While the Third Circuit has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, courts have held that a time span of several months is too great. *See Williams v. Phila. Hous. Auth.*, 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation.); *George v. Genuine Parts Co.*, No. 04-108, 2007 U.S. Dist. LEXIS 5373 at *34-35 (W.D. Pa. Jan. 25. 2007) (holding that while suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. See *Woodson v Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); *Jalil v. Avdel Corp.*, 873 F. 2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipts of the plaintiff's EEOC claim); *Krouse v. American Sterilizer Co.*,126 F.3d 494, 503 (3d Cir. 1997) (explaining that causation prong is not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation). However, timing in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d. Cir. 2000). For example, the Third Circuit held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. *Abramson*, 260 F.3d 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see also Waddell v. Small Tube Prods., Inc.*, 799 F.3d 69 (3d Cir. 1986); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-54 (3d Cir. 1997).

With regard to SCI-Somerset, Rhodes filed union grievances on July 30, 2006, February 6, 2007, February 7, 2007, April 3, 2007, and August 11, 2007. Rhodes filed his first EEOC complaint on

23

January 5, 2006 and his second on July 17, 2006. Rhodes filed an incident report on April 1, 2006. On July 27, 2006[7], Rhodes received his review for the July 2005-July 2006 period. As discussed above, Rhodes received generally lower marks than he had the year before. Rhodes' review came a mere ten days after he filed his second EEOC complaint alleging discrimination, harassment, and retaliation and went from satisfactory the year before to unsatisfactory.

The non-implementation of Rhodes' different shift award occurred between January 4, 2007 and February 2007. Rhodes filed a grievance pertaining to this issue on February 7, 2007, in relation to the denial of the move. Rhodes filed a second EEOC complaint, along with a complaint in this matter on July 17, 2006. Six months passed between Rhodes' filing and the issue with his shift. The Court does not find the timing in this instance to be unusually suggestive, but also notes that since claims of retaliation under Title VII follow the *McDonnell Douglas* analysis, SCI-Somerset presents a business reason as to why Rhodes was denied the move to a new shift: his job was not posted and another R.N. needed to be assigned to the shift to which Rhodes wanted to vacate. Rhodes does not provide evidence contrary to this reason, except the general allegation that his job was not posted because he was a male. The Court finds that Rhodes has not adduced any evidence that SCI-Somerset's business reason was pretextual.

Therefore, Rhodes' only remaining factual averment is that SCI-Somerset lowered his evaluation for the July 2005-July 2006 in retaliation to his complaining of sexual harassment and discrimination.

---

[7]Defendants claim that Rhodes initially stated that his 2006 evaluation contained lower evaluations in his second EEOC complaint, but then corrected himself in his deposition and said it was his 2005 evaluation. However, Rhodes expressed that he was unsure about whether it was the 2005 or 2006 evaluation that contained lower evaluations. He stated that he could check and Defendants' counsel told him that checking was not necessary. Therefore, the Court believes that Rhodes meant the 2006 evaluation that demonstrates a lowering in his evaluations.

24

This Court has already found that there is temporal proximity between the filing of the second EEOC complaint and the instant case and Rhodes' receipt of his evaluation. However, the Court finds no evidence of intervening antagonism in the period between the filing and the review. Also, the Court cannot find evidence of antagonism perpetrated by the management at SCI-Somerset. Rhodes detailed alleged issues with his co-workers that included insubordination, but it has already been determined that management's behavior with regard to these behaviors did not rise to the level of retaliation. SCI-Somerset also gave a nondiscriminatory reason for the lowering of Rhodes' review, stating that he was having problems as charge nurse. Such problems included time management, communication and relationships with co-workers, and Rhodes' refusal to ask co-workers for assistance. Rhodes has not raised evidence that these reasons were not legitimate. Rhodes stated that there were four other male nurses that worked at SCI-Somerset, and that none of these individuals had issues with co-workers. Rhodes acknowledges that he did not get along with his co-workers and had issues getting them to listen to him and perform work tasks. Since this Court has already determined that these problems were not related to Rhodes' gender, evidence of Rhodes having issues with his co-workers supports only that they did not get along well. Even though Rhodes received a lower evaluation in 2006, he continued to receive raises and bonuses. Rhodes provides no tangible evidence of this review having a detrimental effect on him. As such, Rhodes cannot support claims for retaliation against SCI-Somerset.

### d. Claims against Gerald Rozum

Rhodes does not adduce separate factual allegations against Gerald Rozum. The Court finds no reason to conclude that the outcome of the claims against Gerald Rozum would differ from those against SCI-Somerset; therefore, such claims, as a matter of law, cannot succeed.

25

## III. Conclusion

For the reasons stated above, the Court has determined that no material facts require trial for resolution. Furthermore, after applying the governing law to the established facts, because Plaintiff cannot possibly succeed on any his claims, Defendants SCI-Somerset and Gerald Rozum are entitled to judgment as a matter of law; therefore, their summary judgment motion is granted. An appropriate Order follows.

**AND NOW**, this 23rd day of February 2009, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the SCI-Somerset and Gerald Rozum's Motion for Summary Judgment (Doc. No. 33) is GRANTED in its entirety.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT**
**JUDGE**